**Jordan K. Cameron (12051)**
  jcameron@djplaw.com
**DURHAM JONES & PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Fax: (801) 375-3865

**Attorneys for Plaintiff XMission, L.C.**

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>     Plaintiff,<br><br>vs.<br><br>DOES 1-10,<br><br>     Defendants. | **COMPLAINT**<br><br>Case No.: 2:19cv00604<br><br>Judge Bruce S. Jenkins |

COMES NOW Plaintiff XMission, L.C. ("XMission"), and complains and alleges the following:

PARTIES

1. Plaintiff XMission is a Utah limited liability company with its principal place of business in Salt Lake City, Utah, and at all relevant times hereto was duly registered and licensed to do business in the State of Utah.

2. Defendants Does 1 through 10 are unknown entities who are either transmitting or procuring the transmission of commercial emails in violation of the CAN-SPAM Act.

3. The Defendants have sent tens of thousands of emails to XMission's customers in 2019.

4. The emails contain encrypted tracking information or contain redirect and/or tracking domains that are privately registered or registered with false information. Therefore, XMission is unable to identify the responsible parties.

5. The emails advertise a wide variety of products, including as examples: cannabis; male member enlargement; tax help; debt relief; blood pressure solutions; diabetes solutions; keto diet; and weight loss.

6. The emails all contain the same tracking domains. However, the domains' registration information is not publicly available. The emails also appear to have been sent using software or other products offered from domestic companies such as Buffer, Inc.

7. The emails contain links to websites, none of which appear to identify legitimate companies. For example, many of the emails link to websites promoting a company called Self Upgrade Ventures, with various addresses in Utah, including 15 S 1400 W Lindon, UT 84042. However, no such company by this name is registered in Utah, and no such address appears to exist.

8. Because XMission has been unable to identify the parties responsible for the emails, they are named herein as Does 1 through 10.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), for violations of the 15 U.S.C. §7701 *et seq.* (CAN-Sspam Act of 2003), and pursuant to 15 U.S.C. § 7706(g)(1) (original jurisdiction) for cases involving a civil action by an internet

access service adversely affected by a violation of 15 U.S.C. §7704(a)(1), 15 U.S.C. §7704(b), or 15 U.S.C. § 7704(d), or a pattern and practice that violates subparagraphs (2), (3), (4), and/or (5) of 15 U.S.C. § 7704(a)

10. This Court has personal jurisdiction over the Defendants because the Defendants, and each of them, are residents of the state of Utah, are businesses organized and existing under the laws of the state of Utah, have held themselves out as having physical addresses in Utah, and/or have purposefully availed themselves of the privileges of conducting commercial activity in the forum state, in part, through the sending of thousands of commercial e-mails into the state, and the exercise of jurisdiction is reasonable since Defendants should have known that they would be subject to the jurisdiction and laws of the forum state when they sent, or caused the commercial e-mails to be sent to customers of an e-mail service provider located in Utah.

11. The emails in question evidence Defendants' efforts to target recipients in Utah, including sending thousands of spam emails to email addresses including domains that clearly identify the state of Utah.

12. Venue is proper pursuant to 18 U.S.C. §1391, as a substantial part of the unlawful actions by the Defendants, and each of them, occurred in this judicial district.

GENERAL ALLEGATIONS

13. XMission was founded in 1993 as Utah's first dial-up Internet Service Provider ("ISP").

14. From its early days as a private, Utah ISP, to its current role as a global business Internet provider, XMission has expanded its technical offerings to include sophisticated cloud hosting, web hosting, e-mail service and hosting, collaboration tools, business VoIP phone

service, and high speed internet connectivity solutions including optical Ethernet, copper and fiber.

15. Throughout its history, XMission has also worked with hundreds of Utah's nonprofit organizations by providing free web hosting services, and by sponsoring a variety of community-based events and facilities.

16. XMission is a widely known and well-recognized ISP in Utah.

17. XMission owns all the servers, routers, and switches on its network through which it hosts and provides its Internet access services for its customers.

18. XMission has an expansive network and infrastructure, which it has had to consistently update, upgrade, and augment in order to combat ongoing spam problems.

19. XMission is the sole owner of all its hardware, and has complete and uninhibited access to, and sole physical control over, the hardware.

20. As a legitimate and leading ISP, XMission is a bona fide Internet Access Service ("IAS") as that term defined under 15 U.S.C. §7702(11), 47 U.S.C. §231(e)(4).

21. XMission provides Internet access services to both commercial and residential customers.

22. The e-mail accounts hosted and served by XMission include e-mail accounts owned by third-party customers of XMission, e-mail accounts owned by employees and/or customers of XMission's third-party customers, e-mail accounts owned by employees of XMission, and also e-mail accounts owned by XMission itself.

23. For purposes of this Complaint, "spam" is defined as commercial electronic mail messages (e-mail).

24. Throughout 2019, XMission received over 50,000 spam e-mails, sent and/or initiated by the Defendants.

25. Each of the emails contains a common thread, a tracking link that includes the domain armillagdns.com and/or buff.ly.

26. The spam emails independently and collectively adversely affected XMission, and independently and collectively contributed to an overall spam problem suffered by XMission.

27. Each of the Doe Defendants is an "initiator" of the spam emails messages as they either transmitted or procured the transmission of the emails in question as such term is defined in 15 U.S.C. § 7702 and 7706(g)(2).

28. Some of the Doe Defendants may also qualify as a "sender" of the spam emails as defined in 15 U.S.C. §7702(16) as they either transmitted or procured the transmission of the emails in question and as their product, service or website is promoted by the emails.

29. On information and belief, the Defendants individually or acting in concert with each other, sent additional spam emails that XMission has been unable to connect directly with them due to the misleading nature of the information in the emails.

30. Each of the e-mails is a commercial message and contains commercial content.

31. The e-mails, and each of them, were received by XMission on its mail servers located in Utah.

32. Throughout its business, XMission has expended significant sums of money in hardware acquisition, maintenance and related expenses to increase capacity to deal with increased spam and related harm, spam filtering expenses, and employee time in dealing with problems caused by its receipt of spam generally.

33. On average, XMission expends hundreds of thousands of dollars per year in dealing with spam related issues and associated employee time, exclusive of attorney fees.

34. The harm XMission continues to suffer, as the result of its collective spam problem, is much more significant than the mere annoyance of having to deal with spam or the process of dealing with spam in the ordinary course of business (i.e., installing a spam filter to flag and discard spam).

35. The harm XMission suffered, and continues to suffer, is manifested in financial expense and burden significant to an ISP; lost employee time; lost profitability; the necessity to purchase and dedicate equipment specifically to process spam that could otherwise be dedicated providing internet access services; harm to reputation; and customer and e-mail recipient complaints.

36. Each of the emails in question violates at least one provision of the CAN-SPAM Act.

FIRST CAUSE OF ACTION

**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1)**

37. Each of the previous paragraphs is realleged herein.

38. The CAN-SPAM Act makes it unlawful to send e-mail messages that contain, or are accompanied by, materially false or materially misleading Header Information. 15 U.S.C. § 7704(a)(1).

39. An email header is materially misleading when it impairs the ability of an Internet access service processing the message on behalf of a recipient to identify, locate, or respond to a

person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

40. Many of the emails contain false sender names and/or cloaked or private sender information which has impaired XMission's ability to identify and locate the source of the emails and has required XMission to expend significant time and energy in its attempts to locate the responsible parties for the emails and get the emails to stop.

41. Accordingly, XMission prays for relief in the amount of $100 per violation of 15 U.S.C § 7704(a)(1) pursuant to 15 U.S.C. § 7706(g)(3).

SECOND CAUSE OF ACTION

**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1)(A)**

42. Each of the previous paragraphs is realleged herein.

43. The CAN-SPAM Act makes it unlawful to send email messages that contain, or are accompanied by, materially false or materially misleading Header Information.  15 U.S.C. §7704(a)(1).

44. "Header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading."  15 U.S.C. § 7704(a)(1)(A).

45. In order to obtain the domain names from which to send emails, domain registrants are required to provide a name and address to the domain registrar for inclusion in the public WHOIS database.

46. The name and address provided by the domain registrant to the domain registrar constitute material representations.

47. Any email sent from domains registered with false or incomplete names and/or addresses violates of §7704(a)(1)(A).

48. Many of the emails in question violate 15 U.S.C § 7704(a)(1)(A) in that the emails were transmitted from domains registered with false, misleading or incomplete contact information.

49. Pursuant to 15 U.S.C. § 7706(g)(3), XMission prays for relief in the amount of $100 per violation of 15 U.S.C § 7704(a)(1).

### THIRD CAUSE OF ACTION

### CAN-SPAM ACT, 15 U.S.C. § 7704(a)(4)

50. Each of the previous paragraphs is realleged herein.

51. The CAN-SPAM Act permits a recipient of email to opt out of receiving commercial emails from any sender. 15 U.S.C. §7704(a)(4).

52. If such a request is made, then it is unlawful for the sender—or anyone acting on their behalf—to send or assist in initiating the transmission of a commercial email to that recipient more than 10 days after the request.

53. XMission's *Terms of Service* allow it to unsubscribe from email traffic for its customers.

54. Given the enormous amount of emails XMission has received from the Doe Defendants, XMission has used an automated system to attempt to click on available unsubscribe

links in each of the emails, but such does not appear to have had any significant effect as the emails continued long after available opt-out links were clicked.

54. Accordingly, XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(4) pursuant to 15 U.S.C. § 7706(g)(3).

FOURTH CAUSE OF ACTION

**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(5)**

56. Each of the previous paragraphs is realleged herein.

57. The CAN-SPAM Act requires that every commercial email contain a valid physical postal address of the "sender." 15 U.S.C. § 7704(a)(5)(A)(iii).

58. "Sender" is defined in 15 U.S.C. § 7702(16).

59. Many of the emails pertaining to each Doe Defendant either do not contain any a clearly and conspicuously displayed physical address, do not contain physical address of the "sender" as defined in 15 U.S.C. § 7702(16), or contain a false physical address.

60. Accordingly, XMission prays for relief in the amount of $25 per violation of 15 U.S.C § 7704(a)(5) pursuant to 15 U.S.C. § 7706(g)(3).

REQUEST FOR RELIEF

Plaintiff respectfully requests the following relief:

A. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1).

B. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1)(A).

C. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(4).

D. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(5).

E. Treble damages pursuant to 15 U.S.C. § 7706(g)(3).

F.  Attorneys' fees and costs pursuant to 15 U.S.C. § 7706(g)(4).

G.  Pre and post-judgment interest at the highest rate permitted by law.

H.  Entry of permanent injunction against each Defendant prohibiting each Defendant from sending or causing to be sent email messages to XMission and its customers.

I.  All other relief deemed just in law or equity by this Court.

DATED this 27th day of August, 2019.

DURHAM JONES & PINEGAR, P.C.

/s/ Jordan K. Cameron
Jordan K. Cameron
*Attorneys for Plaintiff*

Plaintiff's Address:
51 East 400 South
Suite 200
Salt Lake City, Utah 84111